The United States Court of Appeals for the 9th Circuit is now in session. Please be seated. Good morning everyone. Welcome to the 9th Circuit. I'll be calling the cases in the order listed. The first case for argument is U.S. v. Shih. Good morning, Your Honors. Anthony Brown for the appellant, Dr. Yu Chi Shih. I'd like to reserve three minutes for rebuttal. All right. This is a sentencing appeal, and it comes down to the question of what the words national security controls under guideline 2M5.1 mean. And the parties are in agreement on a lot of things. They're in agreement that 2M5.1 applies. They agree that there is no definition of national security controls in the guidelines. They agree that the application note for 2M5.1 offers no guidance about how to interpret that provision. And they agree that when analyzing the provision, the courts should look at the nature of the control involved or the control that is charged in the case and not the facts of the case. So all those things are in agreement. Where we disagree is obviously on what the word national security controls means. Now the government offers a definition that is tied to reasons for control that the Bureau of Industry and Security, which I'm going to call BIS, assigns to any one of the export controls in the commerce control list. The problem with the government's interpretation of the guideline is that there's nothing in the sentencing guidelines that references BIS, that references the reasons for control, that even suggests that the sentencing commission had the Bureau of... But I'm not sure that's enough for you to prevail in this case, because your arguments aren't any more along policy lines. In terms of the superfluous argument, the government says that, well, the guidelines appear to... They were created for record-keeping, record-keeping offenses, and then everything else, I guess, falls into the national security realm. How do you respond to that? It's not a policy case. It's a textual interpretation case. What this court has to do is look at the text of the guideline and figure out what the guideline means. Policy is one element of that, but the first thing to look at is the actual text of the guideline. Well, but the text of the guideline, there's no dispute about. It says if it's national security, it falls under one part, and if it's... Perhaps if it's record-keeping, it might fall under another part. What about the text of the reg? Which reg? Well, the ECCN. Now, the ECCN says, here's why this particular product or thing is assigned in the ECCN list, and national security is listed as one of the reasons. Right. So why don't we give deference to that? Well, because that's not what the text says. If the text meant... Well, the text just says national security. You have to figure out whether or not this violation involves national security. So where do we look to find out whether it involved national security? And my question is, why don't we look to the... No. Actually, you have exactly the opposite. So what you said was, we have to decide whether or not it involves national security. If you look at the text of the guideline, that's what it says for proliferation of nuclear, biological, chemical weapons. It says controls relating to or involving those kinds of things. But the text doesn't say that. That's what you would expect it to say if national security is a large concern, or what the sentencing guidelines had in mind. It says, national security controls were evaded. And so the question is, where does that phrase come from? Where does that term, national security controls, come from? And that you want to look to the treaty. No, I want to look to what the statute, the statute that's indexed to the guidelines says. The statutes that... It's not meant to be an exclusive definition, is it, in the statute? It says includes. Where in the statute? Well, you've just read the statute. Oh, I'm sorry. I read the guideline. Yeah. And the guideline says, the higher base offense level applies if, A, national security controls were evaded. And it also says, or controls relating to the proliferation of nuclear, biological, chemical weapons. Right. So the second one seems... I'm sorry. I think I spoke over someone, but... No, go ahead. The second is different than the first, right? National security controls or nuclear proliferation, et cetera. So let's go back to national security controls. Why shouldn't we look at the assignment by an expert agency of a national security concern to this particular ECCN? Well, the question is, what did the sentencing commission have in mind? I'm glad... See if you can answer the question. I'm trying to answer the question by saying the task before the court is to figure out what the sentencing commission meant. And I think the first place to look would be at the statute that's indexed to the guideline. Since there's no index to the regulations, only the statute, the Export Administrative Act is referenced. Then why don't we go there? And when we go there, what we find is there are three categories of export controls that are defined by the statute. One of them is foreign policy controls, which is what I think this is. The other is national security controls. And the third is short supply controls. And the reason that we're arguing that these are foreign policy controls is foreign policy controls are defined as controls that are passed to fulfill obligations of the treaty obligations or international obligations of the United States. There's no question about it. We all agree that the controls in this case were part of the Wassenaar Arrangement, and we all agree that the controls in this case were adopted pursuant to our participation in that international organization. It's an obligation for the United States to pass controls that comply with the Wassenaar. So let me try this again because I really do want to get your answer to this. The First Circuit in the McKee case, McKee case, says we're going to look to the assignment in the ECCNs of a reason for the control, and we're not going to substitute our judgment for that of the executive branch about whether this involves national security. We've got a memdisc that thermal imaging cameras were found to be national security. So what I was trying to ask before, and I'm still not sure I've gotten your answer to, is when we figure out whether something is a national security control, why don't we defer to what the executive branch has told us when they assigned the reason in the ECCN? So two answers to that is, why are we looking at the executive branch as opposed to Congress, which is the statute that passed the statute that's indexed to the guideline? That's the first one. The second one, the answer is that neither McKee nor the case that you're referring to, which I think is Jiang from the Ninth Circuit. You pronounce it better than I. Okay. So neither of those cases involved the argument that we're making right now. They weren't raised in those cases. All right. And McKee is actually looking at something different, not even looking at the export controls. They're looking at the violation of an embargo on Libya. Okay. And when the president embargoed Libya under executive order, in that case, the president specifically stated that he was invoking his national security powers under IEPA in order to- But didn't the executive branch in this case effectively tell us by assigning national security to the ECCN that that's the reason that this sort of thing was on the list? Well, they also put other reasons down for why the guideline should be in place. And I think that leads to an ambiguity about how to apply it. And let me explain this a little bit further. If there are multiple reasons that BIS assigns to a guideline, how are you supposed to decide if it's a national security control as opposed to some other type control which would get a base offense level that's 12 point less? Counselor, I know you wanted to save a little bit of time, but I think Judge Pius had a question. No, I'll pass. Thank you. Thank you. Good morning, Your Honors. Cal Schovicky on behalf of the United States. I want to just jump in on the question that Judge Hurwitz was talking about, about the EARs and why we should or shouldn't look to them. I want to note the EARs, while the Export Administration Act was the law under which the EARs were enacted, they were enacted pursuant to that law. And everybody agrees that a violation of the EARs is a violation of the Act. Yes. And then ultimately adopted under IEPA pursuant to an executive order when the EAA lapsed. So we're talking about a set of regulations that were passed under the law which is indexed to this guideline, which indexing is doing a lot of heavy lifting in the briefs here. Indexing just means it's in the appendix of the guidelines. When you look up a statute, what guideline applies? And multiple guidelines actually, multiple statutes are actually now indexed to this guideline. So I don't know that this indexing to the statute means that we need to incorporate the entire statutory structure into the guideline in order to help interpret what a national security control means. When you go down the export control list and the ECCNs, it looks like every single violation is national security related. So, Your Honor, are you saying like if you look through the EAR and look at all the ECCNs that every single one... It's a really, really broad category. That's correct, Your Honor. I would take a step back actually here when addressing that question and say that as the SOTUS case out of the 2003 case said, the EAR itself is actually a set of national security controls. So the whole notion of this set of regulations is they were passed as a set of national security controls. So the 11th Circuit has actually just come out and said that. This circuit has not opined on what exactly the EAR is, whether it's in whole a national security control or not. In this case, before the district court and in our briefs, we focused on the ECCNs at issue. So there's a question of the broader EAR. You're not arguing that... So for 2M5.1, what gets a level 14? Honestly, I haven't looked through the whole EAR to say what it is. I think that there are probably some regulations, some uses that may not fall under that. But there's also the thing to remember, Your Honor, is that the EAR doesn't just include these ECCNs. It includes things like end user controls. And this isn't in the briefing because it's sort of outside the scope, but there's things such as end user controls, which are controls that say who the end user for a EAR99 good is not scheduled under the EAR. But there are still restrictions on where you can send it or what kind of paperwork you have to do in sending it to another country. So there's end user controls, end use controls. Those are the kind of things that the court was talking about earlier with sort of regulatory or record keeping type violations that may fall under that because you're talking about something that doesn't actually even have an ECCN. It's just EAR99, or that is the ECCN. That's exactly my question because it's hard to imagine kind of the universe of what would trigger a 14 level versus the higher 26. So there are, and they're actually charged in this case, although it's not an issue in this appeal, there were some goods that were exported that were not, they were EAR99, but they were exported without transmission of the proper information about the export in terms of you're required to do some paperwork when you send something to China, for example, that even if it's not controlled, if it's above a certain value in it. So that would be the kind of thing that might fall into that category. Honestly... But let me just go back to Judge Wynn's question because now I want you to respond to this. If every ECCN has after it national security, yes? I don't believe that. So I don't believe that's the case. Okay, that's what I wanted. I don't believe that that's the case. Your Honor, I have not looked at every ECCN, but what I do know is that the BIS, so you have the Wassenaar arrangement where sort of countries come together to normalize definitions. And then we implement that and BIS implements it with a series of reasons for control. Right, that's okay. So this first question is, are all the ECCNs listed as national security? That's not my understanding, Your Honor. To the extent that they're not, and more than one reason is listed, which is true in this case. Yes, Your Honor. Since we don't look at the facts of the case, do we automatically assume that it's national security or how do we know that it isn't one or the other? Well, Your Honor, I would say let's take the example of exactly the ECCNs in this case, there are four reasons for control given for these ECCNs. One is national security, other missile technology, nuclear non-proliferation, and anti-terrorism. I think by the very nature of the descriptions of those reasons for control, they all fall under national security. These are not exclusive. Well, they don't fall within the guideline because the guideline says or, and it says nuclear proliferation. Correct. The only one that maybe missile technology isn't like called out by a word in that guideline, but I think there's a fundamental flaw in the argument that's presented here, which is that national security and other reasons, including foreign policy, are somehow mutually exclusive. The entire way that the United States helps ensure national security, one of the things that we as a country do is do things like go deal with the Wassenaar Arrangement, where we come up with normalized definitions for things like monolithic microwave integrated circuits so that all the countries that are interested in controlling that dual use potential military technology have the same definition. There's one point that I think I'd like to make with respect to this whole sort of treaty foreign policy argument, which is the Wassenaar, so this guideline's been enforced since 1987 when the guidelines were created. The Wassenaar Arrangement came into being in 1996. So before that, there were some other arrangements, and there were periods where there was no sort of multilateral arrangement on how to define dual use goods that should be controlled. So accepting the defense's view of this, that somehow before the Wassenaar Arrangement came up, we had a control on microwave amplifiers that was a national security control, and then the fact that we talked to some other countries about normalizing how we define things turns it into a foreign policy control, that cannot possibly be the case. And I would say flip the argument the other way. If we accept the defense's argument, then the entire EAR is just a set of foreign policy controls because we agreed with some other countries about what should be controlled, and thus none of it is national security. That makes even less sense than it's kind of the contrapositive. So those are my primary points. I don't know if the panel has any other questions. Thank you, Counsel. Thank you, Your Honors. I want to respond to two arguments. First, the idea that the entire EAR, our national security controls, is over-inclusive. The SOTUS case that the government is relying on did not involve the argument that we're making now, and so that case is not really authority for that. But also, it leads to the same issue that we were talking about earlier. We have ECCNs in this case that have multiple designations by BIS. How are we supposed to decide whether they're national security or otherwise? One of the designations is... What are all four of these designations? One of them is anti-terrorism. Doesn't that involve national security? Well, that's the entire question, right? If we're going to go broad and we're going to ask if anti-terrorism involves national security, then doesn't that make everything superfluous here? All export controls involve national security. Even short-supply export controls involve national security in an economic sense. So if we're going to start to separate things like national security controls from controls relating to proliferation of biological weapons, from other kinds of controls that get a lower base offense level, then national security controls has to have some distinct meaning. And if everything involves national security in some way, then it doesn't, and it renders everything else in the guidelines superfluous. That's the problem with the government's definition here. And then the last thing, since the government's raising arguments it didn't have in its brief about the Wassenaar is there was a multinational arrangement that the United States participated in before the Wassenaar arrangement, and it was called the Coordinating Committee. And if the court wants to look at the statute cited by Dr. Xi in the brief, look specifically at the statute that refers to foreign policy controls. It's 50 U.S.C. Appendix Section 2405K. And there you're going to that the Congress referred to the Coordinating Committee specifically, and the necessity of creating regulations for export control specifically in the section that's devoted to foreign policy controls, which is further proof that when this particular guideline was created by the Sentencing Commission, it had foreign policy controls in mind as opposed to national security controls. Okay? We've got your argument. Thank you very much, counsel. The matter is submitted.
judges: PAEZ, NGUYEN, HURWITZ